## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| MARY RIOS SQUIBB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No.  04-3097 |
| | ) |
| MEMORIAL MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

### OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Memorial Medical Center's Motion for Summary Judgment (d/e 41).  Plaintiff Mary Rios Squibb has alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111 and 12112(a), and the Illinois Workers Compensation Act, 820 ILCS 305/1 et seq.  For the reasons set forth below, Defendant's Motion for Summary Judgment is ALLOWED.

### STATEMENT OF FACTS

Plaintiff Mary Rios Squibb began working for Defendant Memorial Medical Center in 1990 as a Certified Nurse Assistant (CNA).  Defendant's Motion for Summary Judgment, Ex., Deposition of Mary Squibb (Squibb

<u>Dep.</u>) at 14.  She became a Registered Nurse (RN) in 1992.  <u>Id.</u>  During her time with Memorial, Squibb suffered several job-related injuries.   In February 1993, while trying to lift a patient, Squibb strained her lower back.  <u>Id.</u> at 20.  As a result of the injury, Squibb had to miss work, but eventually returned to work with a lifting restriction.  <u>Id.</u> at 21-22.  She underwent surgery for the lower back injury.  Squibb's doctor released her from the lifting restriction following the surgery.

On January 12, 1999, Squibb incurred another back injury while working.  This time she injured her back when she and a nursing technician tried to move a patient from a bed to a recliner.  On March 25, 2000, Squibb again injured her back while working as a floor nurse on Floor 2B at Memorial.  The March 25, 2000, workplace injury occurred when she and another nurse, Ruth Ann Cope, tried to move a nonresponsive patient from the bathroom to the bed.  <u>Id.</u> at 25-26.  Because of that injury in 2000, Squibb's physician restricted her from: (1) lifting more than 5 pounds; (2) pushing and pulling; (3) sitting and standing for an extended period of time; and (4) bending and stooping.   <u>Id.</u> at 27; <u>Plaintiff's Response to Defendant's Motion for Summary Judgment (d/e 45)(Plaintiff's Response)</u>, Ex. 3, <u>Doctor's note dated 8/28/00</u>.

2

In December 2000, Squibb underwent another back surgery, which was performed by Dr. Stephen Pineda.  Id.  On April 23, 2001, Dr. Pineda released Squibb to return to work in a light-duty capacity, such as desk duty, but limited her to lifting no more than ten pounds and working for no more than 4 hours a day.  Plaintiff's Response, Ex. 4, Dr. Pineda's note dated 4/23/01.  According to Squibb, her 10-pound lifting restriction continued through approximately July 2001.  Squibb Dep. at 34.  Squibb returned to work on Floor 2B sometime in late April 2001 and attempted to perform work duties within her restrictions.  She was stripped of any tasks involving patient care and lifting and was told to request assistance in the event she was required to lift a patient.  Squibb, however, testified in her deposition that sometimes she had to perform duties that were outside of her doctor's restrictions, including pushing a patient in a wheelchair for discharge.  Id. at 30-31.  She stated that she complained to Linda Eilering, Memorial's Worker's Compensation Coordinator, who told her to talk to her supervisor, David Beatty, about her restrictions and to request assistance.

On May 8, 2001, Squibb filed a worker's compensation claim regarding her 1999 injury.  Defendant's Motion for Summary Judgment,

Ex., <u>Declaration of Michele Frye (Frye Decl.)</u>, ¶ 4.  On May 21, 2001, she

also filed a worker's compensation claim regarding her 2000 injury.  <u>Id</u>.  On

June 19, 2001, Dr. Pineda issued a note indicating that Squibb's restrictions

remained the same.  On July 25, 2001, Dr. Pineda issued another note

indicating that Squibb should not lift more than 10 pounds, which would

exclude most patient encounters.   On August 24, 2001, Memorial

transferred Squibb from working on Floor 2B in patient care to a light-duty,

temporary assignment in the Ostomy and Wound Care office that met her

work restrictions.[1]  Squibb testified that, prior to this move,  she spoke to

Beatty regarding Memorial's inability to accommodate her physical

restrictions as an RN in patient care.

By a letter dated October 18, 2001, Eilering advised Squibb to begin

searching for a permanent position within her physical restrictions.  The

letter stated, in part:

> I also noted in an email from this date, that you were directed
> to begin a search for permanent placement, within your
> restrictions.  You may contact a Human Resource Generalist to
> assist you in this job search.

> Your current restrictions include: working 6 hour shifts, 3 days
> a week, no lifting over 10 pounds, no patient encounters, and

---

[1]Squibb worked in the Ostomy and Wound Care office until December 2002.

desk work as appropriate.

Memorial's *Return to Work Program* will continue to locate appropriate assignments for you, as it can accommodate most any physical restriction, however permanent placement is desired.

Plaintiff's Response, Ex. 8, Eilering letter dated 10/18/01.  On October 23, 2001, Squibb provided Memorial with a return-to-work slip from Dr. Pineda in which he indicated that she could return to patient care 3 days a week, gradually increasing to 5 days a week as she became able, and to "[m]aintain/continue her previous weight restrictions."  Squibb Dep. at 37; Plaintiff's Response, Ex. 9, Dr. Pineda's note dated 10/23/01.

On November 3, 2001, Squibb was placed in another temporary, light-duty position in the Medical Records Department.  Squibb Dep. at 223.  On November 13, 2001, Squibb provided Memorial with another update from Dr. Pineda in which he indicated that he did not believe Squibb could ever lift 50 to 100 pounds.  Id. at 38-39; Plaintiff's Response, Ex. 10, Dr. Pineda's note dated 11/13/01.

In December 2001, Memorial transferred Squibb to a temporary, light-duty position as a unit clerk, inputting lab orders into a computer, answering phones and answering call lights.  Squibb Dep. at 44, 224.  She

remained in that position until August 2002.  Id. at 225.

Sometime in January 2002, despite her lifting restriction, Squibb expressed to Dr. Pineda that she did not like working in a clerical-type position because she was an RN and that she wanted to work as an RN in patient care.  Id. at 40.  On January 15, 2002, Dr. Pineda issued a note indicating that "Squibb may advance to 50 [pound] restriction."  Plaintiff's Response, Ex. 10, Dr. Pineda's note dated 1/15/02.  Pineda provided another update on Squibb's condition on February 26, 2002.  He noted in this update that the pain clinic was changing Squibb's medication and that he "suggested to her that initially she could work three days a week and then she can advance this as tolerated . . . .  Otherwise her status and examination remain without significant changes."  Plaintiff's Response, Ex. 11, Dr. Pineda's note dated 2/26/02.  On April 16, 2002, Dr. Pineda informed Squibb that he believed her 50-pound lifting restriction would remain permanent.[2]  Squibb Dep. at 42.

On August 19, 2002, Memorial transferred Plaintiff to a temporary, light duty RN position on Floor 2B.  According to Michelle Frye, Manager

---

[2]The Court notes that the record reflects that Memorial was not notified that Squibb's lifting restriction was permanent until sometime in late 2002, although Squibb herself was informed of this as early as April 2002.

of Employee Health Services at Memorial, Squibb's light duty position on Floor 2B was a temporary position while her restrictions remained temporary. Defendant's Motion for Summary Judgment, Ex., Deposition of Michele Frye (Frye Dep.) at 39. In that position, Squibb was not to be assigned patients. However, she occasionally had to perform duties that required her to lift a patient. She complained to Beatty about having to work outside her physician's restrictions and was told to request assistance when performing tasks outside her restrictions. She testified that an RN without any physical restrictions was required to lift or transfer a patient. Squibb Dep. at 49.

In November 2002, Squibb settled her worker's compensation claim against Memorial with respect to her 2000 injury. In December 2002, Dr. Pineda informed Squibb that she was at her maximum medical improvement and that the 50-pound lifting restriction would remain permanent. Id. at 49-50. Memorial was notified of this update. Squibb testified that the only restriction that Dr. Pineda had indicated to her at that time was the lifting restriction.

On December 17, 2002, Squibb met with Eilering. Squibb states that Eilering told her at this meeting that she could no longer work in the

light-duty RN position.  Id. at 51.  Based on the conversation that took

place during this meeting, Squibb contends that Defendant Memorial

terminated her employment at this time.  Squibb testified in her deposition

as follows:

Q.      And what did she tell you?

A.      She told me that since my workmen's comp case had
        been settled that I no longer had the position on 2B.

Q.      What else did she say?

A.      Well, I asked her why I didn't.  And she said, Well,
        because your workmen's comp case is settled and you no
        longer have that job.  You will have to find something
        else.  And I said, Well, I have to work tomorrow.  And
        she said, You don't understand.  You no longer have a
        job here.  To have a job here you will have to reapply for
        a job.

Q.      And what else did she say?

A.      She may have said the job was temporary.  And I said, I
        understand that, I think.  But why can't I go back and
        have my job back?  And she said, You don't understand.
        You no longer have a job here.  And I don't know--that's
        all I remember.

Q.      Okay.  Did she tell you during that conversation that
        you would be put on a personal leave of absence to look
        for positions in the hospital that were regular or
        permanent positions?

A.      To be honest, all I know is she told me I no longer had a

job there.  And I was just upset that I was not able to work there anymore.  I don't remember.

Q.    But you were put on a personal leave of absence at that time, right?

A.    I think that's why they have called it.

* * * *

Q.    What I'm trying to get is just the process you went through to find -- when you were put on a -- you were put on a 30-day personal leave of absence, right, as of mid December 2002?

A.    Yes.

Q.    And at that point you were told to look for a job within Memorial that meets your restrictions of 50 pounds, lifting no more than 50 pounds, right?

A.    Yes.

Squibb Dep. at 51-52, 56-57.

Memorial disputes that Squibb was terminated in December 2002. Memorial states that, given Dr. Pineda's assessment that Squibb's restriction would remain permanent, Eilering advised Squibb that she could no longer work in the light-duty position as an RN in patient care and, thus, should look for another position that would meet her permanent restriction. Squibb admitted at her deposition that she received neither a formal letter indicating that she was terminated from her employment in December

9

2002, nor a COBRA notice following her alleged termination in December

2002. <u>Squibb Dep.</u> at 215. Memorial's personnel records for Squibb show

that she was placed on a 30-day personal leave of absence. Additionally,

Squibb acknowledged that Memorial provided her access to job postings.

By a note dated December 31, 2002, Dr. Pineda explained his

assessment of Squibb's physical condition:

> I think realistically 50 pounds would be the maximum weight
> that she can lift.
>
> She is awake and alert. She is able to stand, walk, and fire her
> upper and lower extremity musculature's strongly. . . . I
> certainly think that she is at her maximum medical
> improvement at this point unless the X-rays show something
> different.

<u>Plaintiff's Response</u>. Ex. 15, <u>Dr. Pineda's update letter dated 12/31/02</u>. On

or about January 6, 2003, Jodi Lutz-Sanchez, Memorial's Employee Health

Coordinator, contacted Squibb to discuss her permanent restrictions. She

contacted Squibb after Eilering told her that Squibb had reached her

maximum medical improvement.

On January 9, 2003, Squibb and her husband, John Squibb, met

with Lutz-Sanchez. According to Lutz-Sanchez, she told Squibb that

Memorial would assist her in finding a position, but would not place her in

a position.  Defendant's Motion for Summary Judgment, Ex., Deposition of Jodi Lutz-Sanchez (Lutz-Sanchez Dep.) at 25.  Lutz-Sanchez told Squibb that she would be referred to a Human Resources Generalist who would assist her in finding a position that would accommodate her restrictions.

During this meeting, Lutz-Sanchez gave Squibb a list of jobs available at Memorial.  Id. at 29.  Lutz-Sanchez testified that she also told Squibb that Memorial could not accommodate her in the position of an RN in patient care.  According to Lutz-Sanchez, this was not a reasonable accommodation that Memorial could provide because it would require Memorial to hire another person to carry out the essential job duties that Squibb could not carry out due to her physical restrictions.  Id.  at 25.

At this meeting, Lutz-Sanchez ordered Squibb to undergo a Functional Capacity Evaluation (FCE) in order to assess her physical capabilities within her 50-pound permanent lifting restriction.  According to Lutz-Sanchez this evaluation would help Memorial in finding a suitable position for Squibb.  Id. at 26, 28.  Squibb began her FCE on January 15, 2003, but the test was stopped due to Squibb's rising blood pressure during the exam.  Squibb continued her FCE on January 21, 2003, and it was completed the following day.  Squibb's FCE results showed that she was

able to sit continuously, kneel continuously, stand continuously, twist frequently, bend occasionally, climb occasionally, and push and pull rarely.

The results further indicated, in part, as follows:

> FUNCTIONAL ASSESSMENT:
> **The client demonstrated the following significant abilities:**
> - Material handling abilities in the light physical demand range
> - Good bilateral hand strength and coordination
> - Good balance abilities
> - Good positional tolerances for static standing, prolonged sitting, kneeling and sustained crouching
> - Good elevated work abilities.
>
> **The client demonstrated deficits in the following areas:**
> - Deconditioned state which limited the client's material handling and climbing abilities
> - Trunk instability that limited the client's material abilities
>
> * * * *
>
> ASSESSMENT /RECOMMENDATIONS:
> 1. The client is currently functioning at a light physical demands level, well under the 50# permanent restriction placed on her by her physician. These abilities do not match the physical demands of a registered nurse at Memorial Medical Ctr.
> 2. The client's functional abilities are unlikely to improve drastically given her daily use of medication to control symptoms at her current level of function and the lumbar instability still observed.
> 3. Medical correlation required on the above recommendations.

<u>Plaintiff's Response</u>, Ex. 49, <u>2003 FCE Results</u>.

Based on the FCE results, Squibb states that she has additional

restrictions on her ability to bend, twist, push, pull, climb, reach, kneel, squat, sleep, and engage in sexual relations.  Despite these alleged restrictions, Squibb testified in her deposition that she can bathe herself, brush her teeth, dress herself with some assistance in zipping or buttoning, brush her hair with some difficulty reaching the back, and drive.  She further testified that she rarely cooks, cleans, or goes grocery shopping because of her back pain.

Lutz-Sanchez forwarded a copy of Squibb's FCE results to Dr. Pineda and asked him to assess whether the results were consistent with his diagnosis and to determine whether Squibb could perform the functions of an RN given the physical restrictions.  Dr. Pineda told Memorial that he would not comment on the FCE results since he had not ordered it.  Lutz-Sanchez Dep. at 36.

Sometime in either late January 2003 or beginning of February 2003, Lutz-Sanchez called Squibb and informed her that a part-time Patient Placement Coordinator position had become available and recommended that Squibb apply for the position.  Id. at 38.  Lutz-Sanchez discussed this position with Kisha Hortman, Director of Patient Registration, who oversees the Patient Placement Coordinator position, and Lauren Schmid, Human

13

Resources Generalist, who was responsible for assisting Squibb in finding a position that would be within her 50-pound permanent lifting restriction. The job description for this position indicated that lifting in excess of 50 pounds was required on a daily basis. However, Lutz-Sanchez testified that the description was inaccurate. Lutz-Sanchez stated that she discussed the physical requirements of the position with Hortman and Schmid, and they both confirmed that the position required lifting of only 50 pounds on a daily basis. Lutz-Sanchez Dep. at 39. Accordingly, Lutz-Sanchez advised Squibb that she was qualified for the position.

On January 30, 2003, Squibb filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights (IDHR), claiming that Memorial terminated her employment in December 2002 on account of her disability.

On February 7, 2003, Squibb met with Schmid to discuss applying for the Patient Placement Coordinator position. Squibb subsequently submitted an application for the position. On February 11, 2003, she met with Schmid, Hortman and Kelly Fuller for a job interview. Squibb was offered the job of Patient Placement Coordinator at the end of the interview. Squibb testified that, at some point before working in her new

position, she asked Memorial representatives whether the position would be in line with her physical restrictions, and was told that she met the physical requirements.  Squibb Dep. at 76.

On February 18, 2003, Squibb and her husband met with Frye and Schmid.  At this meeting, Frye told Squibb that she had not been terminated and rehired, but rather merely transferred to the Patient Placement Coordinator position.  Frye also talked to Squibb about her transition from working as a floor nurse to working as a Patient Placement Coordinator, which involved work dealing with the business side of the hospital.  Id. at 73-74.

On February 19, 2003, Memorial sent Squibb a letter confirming the oral offer for the Patient Placement Coordinator position.  Attached to the offer letter was a copy of the job description of the position, including physical requirements.  Id. at 132-33.[3]  Squibb accepted the job offer and began working in her new position on February 24, 2003.  Defendant's Motion for Summary Judgment, Ex., Deposition of Kisha Hortman

---

[3]The Court notes that, other than asking to be returned to her position as an RN on Floor 2B, the Patient Placement Coordinator position was the only position for which Squibb applied during the period of December 2002 to February 2003.  Squibb Dep. at 75.

(Hortman Dep.) at 55.  She worked from 3 p.m. to 8 or 8:30 p.m.  Squibb reported to Tammy Mollohan, who in turn reported to Hortman.

As a Patient Placement Coordinator, Squibb's tasks included answering the phone, taking requests either by phone or by fax for admissions to the facility, writing orders, transferring and discharging patients, and communicating with nurse managers and house supervisors to place patients in hospital rooms. Id. at 62-63.

Squibb missed work on February 25 and 26, 2003.  Plaintiff's Response, Ex. 23, Record of Corrective Action dated 5/3/03 (RCA).  She also missed work on March 26, 2003.  On April 15, 2003, Squibb met with Mollohan who expressed that she had too many absences from work. Squibb testified that she told Mollohan that she had doctor's notes for her absences, but Mollohan refused to accept them.  Squibb Dep. at 77-78.

On April 18, 2003, Squibb met with Hortman and Mollohan to review her probationary performance appraisal checklist.  Plaintiff's Response, Ex. 22, Probationary Performance Appraisal Checklist, 4/18/03 (PPAC).  According to this form, Squibb received a mark of "Below Expectations" in the following categories: "Dependability/Attendance," "Job Knowledge," "Quality of Work," and "Motivation/Initiative."  Id.  She

16

received a mark of "Meets Expectations" in the following categories: "Interpersonal Skills," "Quantity of Work," and "Accepts Direction." <u>Id.</u> Squibb testified that she was told at this meeting that she was having some performance problems, which included her failure to pay attention to detail on documents. <u>Squibb Dep.</u> at 79. Also at this meeting, Hortman counseled Squibb regarding her excessive absences. According to Squibb, Hortman also told her, "This is not your workmen's comp case. That has been settled. You don't get off because you are sick because of your workmen's comp case." <u>Id.</u> at 79-80.

Squibb again missed work from April 23 through May 1, 2003. <u>RCA</u>. On April 25, 2003, Hortman revised the job description for the Patient Placement Coordinator position. The new job description indicated that a person working in such a capacity is required "to push/pull or transport objects weighing": (1) less than 5 pounds on a daily/hourly basis, (2) 5 to 20 pounds on a daily/hourly basis, (3) 20 to 50 pounds on a daily/hourly basis, (4) 50 to 100 pounds on a monthly basis, and (5) more than 100 pounds on a monthly basis. <u>Plaintiff's Response</u>, Ex. 58, <u>Patient Placement Coordinator Job Description</u>.

On May 2, 2003, Squibb received another corrective action because

17

of her attendance problem. She met with Mollohan and Hortman who counseled her about her excessive absences and gave her a copy of Memorial's attendance policy. Squibb Dep. at 81.

Squibb stated that, sometime in May 2003, she had to perform duties outside of her physical restrictions. She testified that she had to push a patient in a wheelchair and also lift a patient into a wheelchair. She testified that she performed such duties at the direction of other employees at Memorial, not her supervisor Mollohan.

Squibb testified that during the month of May she provided Memorial with numerous doctor's notes substantiating her absences from work. Id. at 82-83. Given Squibb's absences, however, Memorial decided to place her on a leave of absence effective May 12, 2003.[4] Id.; Plaintiff's Response, Ex. 24, Holley Tygrett's letter dated 5/22/03. Memorial informed Squibb of this decision. In July 2003, Squibb submitted a doctor's note, which indicated that she was "off work at this time [and] may resume work when she feels able." Plaintiff's Response, Ex. 78, Dr. Pineda's note dated 7/7/03. Squibb was placed on a leave of absence until April 21, 2004.

---

[4]The Court notes that Squibb was placed on a leave of absence from May 2003 to January 2005.

During Squibb's leave of absence, Memorial made numerous requests, asking her to provide Memorial an updated documentation of her condition if she wanted to remain on an unpaid leave of absence beyond the date of April 21, 2004.  Squibb Dep. at 84-90.

On April 30, 2004, Plaintiff filed the instant Complaint.  By letters dated May 26 and June 2, 2004, Memorial again told Squibb that it had not received an updated medical documentation supporting her need to remain off work.  On June 4, 2004, Plaintiff submitted a note from Dr. Pineda which indicated that she could "return to lite [sic] duty – exact limits should be determined by a FCE."  Plaintiff's Response, Ex. 35, Dr. Pineda's note dated 6/4/04.  Memorial states that, prior to Squibb's return to work, it wanted to know whether Squibb's 50-pound lifting restriction had remained the same.  As a result, on June 22, 2004, Frye sent a letter to Dr. Pineda requesting information regarding Squibb's physical restrictions and whether her 50-pound permanent lifting restriction remained the same.  Plaintiff's Response, Ex. 37, Frye's letter to Dr. Pineda dated 6/22/04 (6/22/04 letter).  Frye sent a letter to Squibb on August 11, 2004, indicating that Memorial was still waiting for Dr. Pineda's clarification on her 50-pound lifting restriction.  The letter stated, in part:

It is necessary to have your restrictions clarified prior to a Functional Capacity Examination and in order to assess your return to work. We need Dr. Pineda's cooperation and response in this matter. We encourage you to contact him and to stress the importance of providing us with the requested information.

<u>Plaintiff's Response</u>, Ex. 38, <u>Frye's letter to Squibb dated 8/11/04 (8/11/04,</u>

<u>letter)</u>.

Squibb testified that, at some point, she told Dr. Pineda that she did not want him to communicate with Frye regarding the information she had requested. <u>Squibb Dep.</u> at 120. She testified that she wanted Memorial's request for information to go through her attorney. <u>Id.</u> Squibb said that around August 2004, she spoke with Eilering on the phone. Eilering also requested information regarding whether Squibb's permanent restrictions had changed, and Squibb told her that she still had lifting, sitting and standing restrictions. <u>Id.</u> at 106. Squibb stated that other than Dr. Pineda's note dated June 4, 2004, she did not provide any further documentation to Memorial during the period from June 2004 to February 2005. <u>Id.</u> at 130.

Because of Squibb's failure to provide any further medical documentation regarding whether her restrictions had changed, Memorial states that it did not see the need to order a FCE. Squibb, however,

contends that Memorial was responsible for scheduling her FCE.  Sometime in December 2004, Frye contacted Squibb's attorney and asked that Squibb come in to meet with her.  <u>Frye Decl.</u>, ¶ 8.  Frye contacted Squibb's attorney to assist Squibb in finding a job at Memorial.  <u>Id.</u> at ¶ 6.

On December 16, 2004, Squibb submitted applications for the Local Medical Review Policy (LMRP) Analyst and Coordinator positions.  <u>Squibb Dep.</u> at 142; <u>Plaintiff's Response</u>, Ex. 39, <u>Job Application Submission</u>.  The physical requirements of the LMRP Coordinator position included, among other things, the ability to perform "[g]ross body coordination such as walking, standing, stooping, filing, etc.," on a daily/hourly basis, as well as the ability to perform tasks which required reaching at and above the shoulder on a daily basis.  <u>Plaintiff's Response</u>, Ex. 40, <u>Physical Requirements of LMRP Coordinator position</u>.

Ruth Ann Cope, who also had a 50-pound permanent lifting restriction, has worked as a LMRP Coordinator since 2002.  Cope testified in her deposition that she told Squibb that she did not see any reason why Squibb would not be qualified for the coordinator position, but that the Human Resources Department would be the one making the decision.  <u>Defendant's Motion for Summary Judgment</u>, Ex., <u>Deposition of Ruth Ann</u>

Cope (Cope Dep.) at 20.

Following the receipt of Squibb's job applications for the two LMRP positions, Anita Lengacher, Human Resources Generalist, contacted Squibb to discuss a job opening for the Clinical Case Manager position. Squibb met with Lengacher and Hortman, who supervised both the LMRP positions and the Clinical Case Manager position. At this meeting, Lengacher and Hortman told Squibb that she was not qualified for the LMRP Coordinator position because she lacked the requisite cardiac or laboratory experience, and that she lacked the necessary insurance coding experience for the LMRP Analyst position. They, however, told her that she would be qualified for the Clinical Case Manager position.

Hortman told Squibb that the Clinical Case Manger position involved similar duties to those that Squibb had performed as a Patient Placement Coordinator. Hortman further told Squibb that even though she had some performance difficulties with the Patient Placement Coordinator position, she could successfully perform the new job with a little more training. Squibb Dep. at 149-150. Additionally, the physical requirements of the Clinical Case Manager position indicated that lifting of 20 to 50 pounds was necessary on a monthly basis, but included no lifting of 50 to

100 pounds.  Plaintiff's Response, Ex. 41, Physical Requirements of Case Manager Position.

When Squibb applied for the LMRP positions, the job description did not state that cardiac and laboratory billing experiences were required. Memorial states that even though the above requirements were not included in the job description at that time, it determined that such requirements were necessary given that "these were two of the highest write-offs for reimbursement from insurance companies."  Defendant's Motion for Summary Judgment at 23; Hortman Dep., 96, 138.

Squibb states that, during the meeting with Hortman and Lengacher, she told them that she had some cardiology experience because she once worked on a cardiology floor as a float.  Squibb Dep. at 151-52.  Squibb further states that she has insurance coding experience because she "used to do insurance forms.  And [she] used to file insurance for Medicare and Medicaid."  Id. at 154.  Moreover, Cope testified that she learned the requisite coding experience on the job.  Cope Dep. at 19.  Memorial states that the job requirements at the time when Cope had applied for the LMRP Coordinator position were different from the current requirements of the LMRP Coordinator and Analyst positions.

On December 28, 2004, Memorial offered Squibb the position of Clinical Case Manager, but she declined the offer.  <u>Plaintiff's Response</u>, Ex. 43, <u>Offer letter dated 12/28/04</u>.  Squibb states that she told Frye that she could not physically perform the job due to her 50-pound permanent lifting restriction.  Frye denies this.  Squibb testified that, based on what she was told regarding the similarities between the positions of Patient Placement Coordinator and Clinical Case Manager, she thought that she had to lift over 100 pounds.  <u>Squibb Dep.</u> at 156-57.  Plaintiff turned down the offer without requesting an accommodation for the position.  <u>Id.</u> at 205.

On January 4, 2005, Memorial notified Squibb that her job applications for the LMRP positions were denied.  Squibb argues that she was denied these positions because of her disability and perceived disability. According to Hortman, Memorial eventually hired two individuals with the requisite coding experience for the LMRP Analyst position.  <u>Hortman Dep.</u> at 109.  With respect to the LMRP Coordinator position, Shirley Kirk, Vice President of Human Resources at Memorial, states in her Affidavit that the LMRP Coordinator position was posted between October 2004 and January 31, 2005.  <u>Defendant's Motion for Summary Judgment</u>, Ex., <u>Declaration of Shirley Kirk (Kirk Decl.)</u>, ¶ 3.  She further states that based on her review

of the human resources record, "27 individuals applied for the LMRP Coordinator position and none of them were hired for the position." Id. She further attests that the Coordinator "position was since eliminated and is now a managerial position." Id.  On January 5, 2005, Memorial again offered Squibb the Clinical Case Manager position, but she declined. Squibb Dep. at 159; Plaintiff's Response, Ex. 45, 2nd Offer letter for Clinical Case Manager position.

On January 24, 2005, Squibb was terminated from her employment. According to Kirk, Memorial terminated Squibb because she failed to return to work from her leave of absence after being offered the Clinical Case Manager position.  Kirk Decl., ¶ 9.

Squibb has filed a ten-count Complaint against Defendant Memorial. Count I alleges that Memorial failed to reasonably accommodate her disability in violation of the ADA; Count II alleges that Memorial wrongfully discharged her on December 17, 2002, because of her disability or perceived disability in violation of the ADA; Count III alleges that Memorial wrongfully discharged her, on December 17, 2002, in violation of the Illinois Workers Compensation Act; Count IV alleges that Memorial failed to reasonably accommodate her disability and subsequently

terminated her employment in January 2005, for refusing a job that she physically could not perform due to her disability, in violation of the ADA; Count V alleges that Memorial retaliated against her for exercising her rights under the ADA by terminating her employment in January 2005; Count VI alleges that Memorial failed to hire her as a Local Medical Review Policy Coordinator because of her disability in violation of the ADA; Count VII alleges that Memorial failed to hire her as a Local Medical Review Policy Analyst because of her disability in violation of the ADA; Count VIII alleges that Memorial retaliated against her for exercising her rights under the ADA by failing to hire her as a Local Medical Review Policy Coordinator; Count IX alleges that Memorial retaliated against her for exercising her rights under the ADA by failing to hire her as a Local Medical Review Policy Analyst; and Count X alleges that Memorial wrongfully discharged her in January 2005, in violation of the Illinois Workers Compensation Act.

<u>ANALYSIS</u>

Memorial seeks summary judgment on all counts. At summary judgment, Memorial must present evidence that demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to Squibb. Any doubt as to the existence of a genuine issue for trial must be resolved against Memorial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Once Memorial has met its burden, Squibb must present evidence to show that issues of fact remain with respect to an issue essential to her case, and on which she will bear the burden of proof at trial. <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). When the evidence in the record is viewed in the light most favorable to Squibb, Memorial is entitled to summary judgment.[5]

---

[5]The Court notes that Plaintiff has completely disregarded the Central District of Illinois Local Rules in filing her Response to Defendant's summary judgment motion. Defendant has not filed a separate motion to strike, but complains in its reply brief that Plaintiff has utterly failed to comply with the Local Rules and, therefore, moves to strike many of Plaintiff's statement of disputed material facts and her statement of additional material facts, as set forth in her response brief. The Seventh Circuit, in <u>Waldridge v. American Hoechst Corp.</u>, held that the district courts have discretion to determine whether the local rules governing summary judgment motions should be applied strictly. <u>Waldridge</u>, 24 F.3d 918, 923 (7th Cir. 1994). While the Court recognizes that Plaintiff's statement of disputed material facts and her statement of additional facts are deficient

I.      Discrimination Claims under the ADA: Counts I, II, IV, VI, and VII

        A.   "Disabled"

Count I alleges that Memorial failed to reasonably accommodate Squibb's disability in violation of the ADA. Count II alleges that Memorial wrongfully discharged her on December 17, 2002, because of her disability or perceived disability, in violation of the ADA. Count IV alleges that Memorial failed to reasonably accommodate her disability and subsequently terminated her employment in January 2005, for refusing a job that she physically could not perform due to her disability, in violation of the ADA. Count VI alleges Memorial failed to hire her as a LMRP Coordinator because of her disability in violation of the ADA. Count VII alleges that Memorial failed to hire her as a LMRP Analyst because of her disability in violation of the ADA.

─────────────────

for numerous reasons, the Court will not strike such statements because, even if all such facts are considered, Defendant is still entitled to summary judgment. The Court admonishes Plaintiff's counsel, again, that her failure to follow the Local Rules may lead to her submissions being struck in the future.

    Defendant also complains that statements contained in Plaintiff's Affidavit violate the requirements of Federal Rule of Civil Procedure 56(e). Rule 56(e) requires that an affidavit be based on personal knowledge of the affiant, set forth facts admissible in evidence, and show that the affiant is competent to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(e). Again, the Court recognizes that some of the statements in Plaintiff's Affidavit violate the requirements of Rule 56(e). The Court will, however, consider such statements for what they are worth, because even if such statements are considered, they fail to raise a genuine issue of material fact that would preclude summary judgment.

As a threshold matter, in order to prevail on her ADA claims, Squibb must demonstrate that: (1) she was disabled; (2) Memorial was aware of her disability; and (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position.  Basith v. Cook County, 241 F.3d 919, 927 (7th Cir. 2001) (citing McPhaul v. Bd. of Comm'rs of Madison County, 226 F.3d 558, 563 (7th Cir. 2000)).  Under the ADA, the term disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  In order to trigger the protections of the ADA, "an individual must be so limited in one or more major life activities that she is impaired in her ability to 'perform the variety of tasks central to most people's lives.'"  Rooney v. Koch Air, LLC, 410 F.3d 376, 381 (7th Cir. 2005) (quoting Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 201 (2002)).

The EEOC regulation lists the following functions as major life activities: "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

This list is not exhaustive; functions such as sitting, standing, and lifting are also considered major life activities.  29 C.F.R. app. § 1630. 2(i).  The courts have held that sleeping is a major life activity.  See Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999); see also Bond v. Sheahan, 152 F.Supp.2d 1055, 1064 (N.D. Ill. 2001).  The Supreme Court has stated that an individualized inquiry is required when determining whether a person has an impairment that substantially limits one or more major activities.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999).

Squibb claims that her physical restrictions substantially limit her in the major life activities of working in a class of jobs, engaging in sexual relations, sleeping, walking, sitting, and caring for herself and her family.  In the alternative, she argues that Memorial regarded her as having a disability that substantially limited one or more major life activities.

### 1.    Major Life Activity of Work

Squibb contends that her 50-pound permanent lifting restrictions, as well as her alleged limitations in sitting, pushing, pulling, climbing, and bending, substantially limited her ability to work.  In viewing the evidence in the light most favorable to Squibb at this stage, the Court finds that she has failed to show that her 50-pound lifting restriction and her other alleged

physical limitations amount to a substantial limitation or significant restriction in her ability to work.

It is undisputed that Squibb has a 50-pound permanent lifting restriction, as evidenced by the notes issued by Dr. Pineda.  However, Squibb's assertion that she has additional restrictions is not supported by the evidence in the record.  The evidence in the record includes numerous notes from Dr. Pineda dating back to 2000 and Squibb's FCE results of January 22, 2003.  Back in 2000, Dr. Pineda restricted Squibb from lifting in excess of 10 pounds, pushing, pulling, sitting, and standing for an extended period of time.  Since then, Dr. Pineda has released her from all of the restrictions except the lifting restriction, which has been increased to 50 pounds.

Dr. Pineda's most recent note dated June 4, 2004, stated that Squibb has a permanent 50-pound lifting restriction and that she could return to light duty work.  Furthermore, Squibb's FCE results indicated that she has "[g]ood positional tolerances for static standing, prolonged sitting, kneeling, and sustained crouching," as well as "good elevated work abilities." 2003 FCE Results.  The results, however, stated that Squibb demonstrated deficits in the following areas: (1) "Deconditioned state which limited

31

[Squibb's] material handling and climbing abilities." Id.  The results also indicated that "[Squibb] is currently functioning at a light physical demands level, well under the 50# permanent restriction placed on her by her physician." Id.  Squibb's FCE results also indicated that medical correlation was required on the above recommendations.  Dr. Pineda, however, failed to comment on the FCE results.  Despite the fact that the FCE results suggest that Squibb's lifting ability is well under 50 pounds and that she has some problems with her climbing ability and that she is only able to push and pull rarely, this evidence is insufficient to create a genuine issue of fact as to whether she is substantially limited in her ability to work.  At most, the evidence reflects that Squibb's physical restrictions limit her ability to perform some work tasks, not that she is substantially limited or significantly restricted in her ability to work.

In a case factually similar to the instant case, the Seventh Circuit in Mays v. Principi explained that a nurse who had various restrictions, including a 10-pound permanent lifting restriction, limited to sedantary work, no work at or above shoulder level, and no patient lifting, was not disabled under the ADA.  The Seventh Circuit noted, "It is not as if the plaintiff were missing an arm.  The physician who determined the severity

32

and duration of her back injury thought she could return to her job as a light-duty nurse. The number of Americans restricted by back problems to light work is legion. They are not disabled." <u>Mays</u>, 301 F.3d 866, 869 (7th Cir. 2002) (internal citations omitted).

In another case, the Seventh Circuit found that a plaintiff who was "unable to lift in excess of 45 pounds for a long period of time, unable to engage in strenuous work, and unable to drive a forklift for more than four hours a day" was not disabled as the term is understood within the ADA. <u>Contreras v. Suncast Corp.</u>, 237 F.3d 756, 763 (7th Cir. 2001). The Court further noted that other circuits dealing with factually similar cases have also held that such limitations do not constitute a substantial limitation on working. <u>Id.</u>; <u>See</u> <u>e.g.</u> <u>Williams v. Channel Master Satellite Sys., Inc.</u>, 101 F.3d 346, 349 (4th Cir. 1996); <u>Aucutt v. Six Flags Over Mid-America</u>, 85 F.3d 1311, 1319 (8th Cir. 1996); <u>Ray v. Glidden Co.</u>, 85 F.3d 227, 228-29 (5th Cir. 1996); <u>Wooten v. Farmland Foods,</u> 58 F.3d 382, 384, 386 (8th Cir. 1995).[6]

---

[6]The Court acknowledges the contrary holding in <u>Cochrum v. Old Ben Coal Co.</u>, 102 F.3d 908 (7th Cir. 1996). In <u>Cochrum</u>, the Seventh Circuit found that a roof bolster, who suffered two work-related shoulder injuries which resulted in his physician placing permanent restrictions of no overhead or heavy lifting and no pushing or pulling out from his body, was substantially limited in the major life activity of working. The Court noted that "given the breadth of his physician's physical restrictions, a reasonable

In the present case, Squibb's lifting restriction is not as severe as that of the plaintiff in <u>Mays</u>, despite the fact Squibb's FCE results suggested that her lifting ability may be well under the 50-pound limitation.  However, even assuming that Squibb's lifting restriction is well under 50 pounds, Squibb has failed to established that she is substantially limited in the major life activity of work, especially given that: (1) Dr. Pineda opined that she could return to light-duty work; (2) the FCE results were consistent with Dr. Pineda's assessment, except for the lifting restriction; and (3) Squibb herself indicated, when she was applying for the LMRP positions, that she could perform work at or above her shoulder.

Squibb's claim further lacks merit because she has failed to establish that her physical restrictions preclude her from a class of jobs or a broad range of jobs, as required under the ADA.

---

jury could conclude that Cochrum's shoulder impairment does substantially limit his ability to work." <u>Id.</u> at 911. The present case is distinguishable from <u>Cochrum</u>.  In the instant case, the only restriction indicated by Dr. Pineda was the 50-pound permanent lifting restriction.  As of June 2004, Dr. Pineda indicated that Squibb could return to light duty work.  The 2003 FCE results did not contradict Dr. Pineda's assessment, although it noted that Squibb's lifting ability may be well under 50 pounds.  However, this fact is not enough to raise a genuine issue of fact.  The results further indicated that Squibb had some problems with climbing, pushing, and pulling, but that she could stand, sit, and kneel continuously, as well as twist frequently, and bend occasionally.  The evidence in the record is not sufficient to conclude that Squibb is substantially limited in performing the major life activity of work.

When the major life activity at issue is working, as it is in this case, substantially limits means the claimants were significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  A class of jobs is the job from which a claimant was disqualified, as well as all other jobs utilizing similar training, knowledge, and skills within the geographical area to which the [claimant] has reasonable access.  A broad range of jobs in various classes, in contrast, is the job from which a claimant was disqualified, as well as all other jobs not utilizing similar training, knowledge, and skills within the geographical area to which the claimant has reasonable access.  Thus, according to the [EEOC's] own regulations, its case must include some proof of the number and types of jobs within the geographical area to which the [claimant] has reasonable access.

EEOC v. Rockwell International Corp., 243 F.3d 1012, 1017 (7th Cir. 2001) (citing cases) (internal quotations and citations omitted).  This means that Squibb must present some evidence of "general employment demographics and/or of recognized occupational classifications that indicate the approximate number [and types] of [other] jobs (e.g., 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment.'" Id. (citing Sutton, 527 U.S. at 492-93; Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 524-25 (1999)).  It is not enough to show that an individual's impairment would exclude him or her from either a particular job for a particular employer or a narrow range of jobs.  Kupstas v. City of

Greenwood, 398 F.3d 609, 613 (7th Cir. 2005) (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(j)) (internal citations omitted); See also Sutton, 527 U.S. at 491; Murphy, 527 U.S. at 525; Baulos v. Roadway Express, Inc., 139 F.3d 1147, 1151 (7th Cir. 1998).

In that effort, Squibb asserts that she is excluded from "a broad class of jobs" because she cannot work as a registered nurse in patient care, which she claims constitutes a very large percentage of nursing jobs at Memorial. Squibb further asserts that Memorial employs the majority of nurses in Central Illinois.

Squibb's argument misses the point and is therefore unavailing. As noted above, proof that Squibb is excluded from performing one particular job, specifically nursing jobs in patient care, is not enough to render her disabled under the ADA. Contrary to Squibb's unsupported assertions, the evidence in the record shows that, despite her impairment, there were other types of jobs available for which she was qualified and from which she would not be excluded. For example, Squibb was employed temporarily in the Ostomy and Wound Care office as a clerk; she also worked as a Patient Placement Coordinator, which required a nursing degree and the requisite experience; and she received offers for the Clinical Case Manager position.

36

2.      Other Major Life Activities

Squibb contends that she is substantially limited in the major life activities of sleeping, engaging in sexual relations, caring for herself and her family, walking, and sitting.  Squibb, who is represented by counsel, makes no substantive argument, cites no case law, and makes no reference to the record evidence, in support of her claims.

The Supreme Court has explained that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."  Celotex, 477 U.S. at 323-24.  As such, the failure "to make a minimally complete and comprehensible argument for each of [her] claims" warrants the Court to find that Squibb's claims are without merit.  Luddington v. Indiana Bell Telephone Co., 966 F.2d 225, 230 (7th Cir. 1992) ("If we assume the lawyers' responsibilities, we unbalance the market for legal services and take time away from our consideration and decision of other cases.  So, if an appellant fails to make a minimally complete and comprehensible argument for each of his claims, he loses regardless of the merits of those claims as they might have appeared on a fuller presentation."); See generally Hudgens v. Wexler and Wexler, 391 F.Supp.2d 634, 647 (N.D. Ill. 2005); Salazar v. City of Chicago, 940

37

F.2d 233, 242-243 (7th Cir. 1991) ("The plaintiff, however, offers no argument on this point other than stating the point, and has cited no legal authority to support his assertion.  Therefore, he has waived this argument for appeal."); Tyler v. Runyon, 70 F.3d 458, 465 (7th Cir. 1995) ("Because Tyler has waived this argument on appeal by failing to cite to any authority in support of his argument that the statute of limitations should be equitably tolled, we see no necessity to engage in a discussion of the merits of this issue.").

However, "[t]o avoid any appearance that [this Court is] 'sacrificing substantive justice on the altar of administrative convenience,'" the Court will briefly address the merits of Squibb's claims.  LINC Fin. Corp. v. Onwuteaka, 129 F.3d 917, 922 (7th Cir. 1997) (quoting Luddington, 966 F.2d at 230)).

i.    Activity of Engaging in Sexual Intercourse

Squibb claims that she is substantially limited in engaging in sexual intercourse, which she claims is a major life activity.  However, the Seventh Circuit has not recognized that sexual relations are a major life activity for ADA purposes, even though the Supreme Court in Bragdon v. Abbott held that reproduction is a major life activity.  Contreras, 237 F.3d at 764 n. 6

("We note that notwithstanding the Ninth Circuit's decision in *McAlindin v. San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999), this Court has not established a rule that sexual relations are a major life activity for ADA purposes."); <u>Bragdon</u>, 524 U.S. 624 (1998).  In addition she testified that she cannot have children.  Therefore, any limitation on her ability to engage in sexual relations has not, under her circumstances, interfered with reproduction.  Also, Squibb's claim of the change in the frequency with which she engages in sexual intercourse is solely based on her assertions.  At her deposition, Squibb testified as follows:

> Q.     You also indicate that you are restricted from sexual relations; do you see that?
>
> A.     Yes, I do.
>
> Q.     How are you restricted?
>
> A.     I don't have any.  It hurts my back.
>
> Q.     When is the last time that you had sex?
>
> A.     I bet it's been two years.
>
> Q.     And in the last two years have you had any desire to have children?
>
> A.     I can't have children.
>
> Q.     So the answer is no?

A.      No.

                                    * * * *

Q.      Prior to the time that you had your back injury, which I
        believe started back in 1993?

A.      Yes.

Q.      How often did you have sexual relations?

A.      Two, three times a day every day.  My honey is good.  I
        don't mean during the day, but at night or during the
        evening, of course, because I was at work.  But when I
        wasn't at work, quite often.

Squibb Dep. at 175-6.  Additionally, Squibb has failed to submit any

"documentation or testimony beyond a general assertion that the frequency

with which [she] has [sexual] relations has decreased.  Such a bald

declaration, without anything more, cannot create a genuine issue of

material fact as to" her claim that she is disabled with respect to her ability

to engage in sexual relations.  Contreras, 237 F.3d at 764.

                    ii.     Major Life Activity of Sleeping

        Squibb contends that she is substantially limited in the major life

activity of sleeping.  She testified in her deposition that, due to her back

pain, she is only able to sleep about 3 to 4 hours a day, but that she believed

that she would be able to come into work the next day and perform her

                                      40

duties as a nurse, without any problem.  Squibb Dep. at 174.  Since Squibb's claimed inability to sleep at night would not affect her in performing her duties as a nurse, these bare assertions, without more, do not demonstrate that Squibb is substantially limited in the major life activity of sleeping.  Indeed, she has failed to come forward with any evidence of how her sleeping problems are affecting her daily life.  See Bond, 152 F.Supp.2d at 1066 (finding that the plaintiff was not substantially limited in the activity of sleeping because the record did not indicate the severity of the plaintiff's sleeping problems, how long she experienced difficulty sleeping, or how it affected her daily life).  Accordingly, the Court finds that Squibb has failed to establish that her impairment substantially limits the major life activity of sleeping.

iii.    Major Life Activity of Caring for Oneself

Squibb claims that her impairment substantially limits the major life activity of caring for herself and her family.  As noted earlier, the central inquiry, when evaluating whether an impairment substantially limits the major life activity of performing manual tasks, is whether the person is unable to perform the variety of tasks central to most people's daily lives.  Toyota, 534 U.S. at 200.  In order to satisfy this strict standard, the

plaintiff must present evidence detailing his or her own experience of how the alleged impairment has substantially affected his or her daily life and specifying whether his or her impairment is long term or permanent.  Id. at 198-99.

Because of her disability, the plaintiff in Toyota had to avoid sweeping, quit dancing, reduce the time she played with her children, and occasionally seek help dressing.  Id. at 202.  The Supreme Court held that she was not disabled within the meaning of the ADA.  Id.  This was because, according to the Supreme Court, tasks that she claimed she could perform, such as her ability to brush her hair, wash her face, bathe, tend her flower garden, make breakfast, do laundry, and pick up around the house, were tasks more central to her daily life.  Id.

In this case, presumably relying on her deposition testimony, Squibb asserts that "[she] has problems dressing herself and is unable to do activities of daily living such as cleaning, cooking, laundry and shopping." Plaintiff's Response, 79.  At her deposition, Squibb testified that she can drive, bathe herself, brush her teeth, dress herself, with some difficulty zipping, and brush her hair, with some difficulty reaching the back side. She further testified that, because of her back pain, she hardly cooks, cleans,

or goes grocery shopping.  Even though Squibb claims that she is limited in performing household chores, tasks which the Supreme Court found were central to most people's daily lives, these limitations are not enough to show that she is significantly restricted in performing her major life activities, especially given that she is still able to do other tasks that the Supreme Court also viewed as central to most people's lives.  The record shows that Squibb is still able to perform a number of tasks with little or no assistance, including brushing her hair, brushing her teeth, dressing herself, bathing herself, and driving.[7]  Therefore, Squibb is not substantially limited in the major life activity of caring for herself and her family.

> iv.  Major Life Activities of Walking and Sitting

Squibb further claims that she is substantially limited in the major life activities of walking and sitting.  However, these claims are not supported by the evidence in the record.  Indeed, Squibb's FCE results and Dr. Pineda's notes demonstrate that she can sit continuously and walk without any problem.  Squibb is not substantially limited in the major life

---

[7]The Court notes that it is not suggesting that her back problem has not affected her and her family.  However, in order to preclude summary judgment, Squibb must come forward with evidence demonstrating that she is substantially limited in her ability to care for herself.  Squibb has failed to meet this burden.

activities of walking and sitting.

      B.    "Regarded As"

In the alternative, Plaintiff argues that even if she is not disabled, she has a claim under the ADA because Memorial regarded her as having a disability that substantially limited one or more of the major life activities. "Under the 'regarded as' prong, the employer must believe, rightly or wrongly, that the employee has an impairment that substantially limits one or more of the major life activities." Kupstas, 398 F.3d at 612 (citing Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331, 335 (7th Cir. 2004)). "If 'the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute.'" Rooney, 410 F.3d at 382 (quoting Mack v. Great Dane Trailers, 308 F.3d 776, 782 (7th Cir. 2002)).

In support of her argument, Squibb contends that Memorial has a policy in which it prohibits an employee with permanent restrictions, as a result of a work-related injury, from returning to his or her former positions, without providing any reasonable accommodation. Squibb further contends that "Plaintiff was given the death knell classification of 'unassigned staff'

in August 2001 when the Plaintiff's supervisor decided that he could not accommodate the Plaintiff's restrictions." Plaintiff's Response at 81. She states that the fact that Eilering and Lutz-Sanchez told her that she could not apply for job positions at Memorial until she had a FCE, which she claims is illegal under the ADA, shows that Memorial regarded her as disabled. Squibb further argues that Beatty and Eilering told her and Cope that they could not remain in their light duty nursing positions once their restrictions became permanent.

The evidence in the record only suggests that Memorial was aware of Squibb's permanent lifting restriction and that, because of such limitations, she was unable to perform some work tasks, namely lifting over 50 pounds. Indeed, "'an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job.'" Branham v. Snow, 392 F.3d 896, 904 (7th Cir. 2004) (quoting Peters v. City of Mauston, 311 F.3d 835, 843 (7th Cir. 2002)). Accordingly, the fact that Squibb was classified as "unassigned staff" in August 2001 only shows that she was classified as such because, with her lifting restrictions, she could not remain as an RN in patient care.

Squibb's evidence that she was told to undergo a FCE in January

2003 does not suggest that Memorial regarded her as disabled within the meaning of the ADA.  Under the ADA, an employer may not require an employee to undergo a medical examination to determine whether the employee is an "individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4). The EEOC regulations provide further explanation of this provision.  The regulations provides that "[t]his provision permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job."  29 C.F.R. Part 1630, App. § 1630.14(c).

The evidence in the record clearly reflects that the 2003 FCE that Squibb was required to undergo satisfy the requirements of the ADA. Indeed, the evidence that an RN in patient care is required to lift over 50 pounds on a daily basis, and the evidence that Squibb's work-related injury limited her from carrying out such duties, suggest that the requested exam was not only work-related but necessary to determine whether Squibb could perform the essential functions of her job.

The evidence that she was told that she could not remain in her light duty position once her lifting restriction became permanent does nothing to prove that Memorial regarded her as disabled within the meaning of the ADA. The evidence only supports Memorial's contention that Memorial was unable to reasonably accommodate Squibb by finding her a permanent assignment to a light-duty nursing position because such an accommodation would require Memorial to hire another person to accompany Squibb, at all times, and perform the essential job functions. "[T]he ADA does not require permanent assignment to a temporary light-duty job." Devito v. Chicago Park Dist., 270 F.3d 532, 534 (7th Cir. 2001) (citing Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 697 (7th Cir. 1998)). Lastly, the evidence that Cope was also told that she could not remain in her light-duty position as an RN in patient care once her 50-pound lifting restriction became permanent only demonstrates that Memorial treated another employee, with similar physical restrictions, identically to Squibb.

In order to preclude summary judgment, Squibb must present direct or circumstantial evidence from which a jury could reasonably conclude that Memorial regarded her as substantially limited in performing the functions central to most people's daily lives. See Mack, 308 F.3d at 783. What

dooms Squibb's case is that there is no evidence that Memorial erroneously believed that Squibb was disabled within the meaning of the ADA, although it knew that she had a 50-pound lifting restriction.  See Tockes v. Air-land Transport Services, Inc., 343 F.3d 895, 896 (7th Cir. 2003).  The evidence only suggests that Memorial believed that Plaintiff's restriction limited her ability to carry out certain tasks, namely the ability to lift over 50 pounds, not that Memorial perceived her as disabled.

C.  "Qualified Individual"

Even if Squibb is disabled within the meaning of the ADA, her claim still fails because she is not a "qualified individual with a disability."  A two-step test is used to determine whether someone is a qualified individual with a disability: (1) whether the individual possesses the prerequisites for the position, including the educational background, employment experience, skills, licenses, etc. and (2) whether the individual can perform the essential job functions of the position held or desired, with or without reasonable accommodation.  Basith, 241 F.3d at 927 (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996)).

At issue in this case is the second step.  Before examining the second prong of the test, the Court must first determine whether a particular job

function is essential.  Generally, courts look to the following sources to assess whether a particular job function is essential: (1) the employer's judgment as to what job functions are essential, such as a written job description; (2) the amount of time spent on performing the particular function; and (3) the experience of employees who previously or currently hold the position.  <u>Rooney,</u> 410 F.3d at 382 (citing 29 C.F. R. § 1639.2(n)(3); <u>Basith</u>, 241 F.3d at 927.

Squibb contends that lifting is not an essential job function of an RN in patient care.  However, the evidence shows that an RN in patient care is required to lift over 50 pounds on an hourly/daily basis and 100 pounds on a daily basis, all of which demonstrates that lifting is an essential job function of an RN in patient care.  The undisputed evidence shows that, due to her 50-pound lifting restriction, Squibb could not perform this essential job function.  Squibb contends that with reasonable accommodations, however, she could perform the essential job functions of an RN in patient care.  Specifically, she asserts that she could perform the essential job functions of an RN in patient care as long as someone assisted her with lifting or she was not required to do any lifting outside of her restriction.  To bolster her argument that reasonable accommodations were

available at Memorial, she points out that Memorial regularly employed certified nurse aids and nursing technicians who were primarily responsible for lifting and transporting patients.  She further notes that Memorial had initiated ergonomics initiatives such as lifting equipment to assist people with lifting.

Memorial argues that Squibb's request to be restored to her original position in patient care would be unreasonable because this would require Memorial to hire an employee to accompany her, at all times, to carry out the essential job function.  The Court finds that such an accommodation is not reasonable, but extraordinary and thus is not required under the ADA. "'An employer need not reallocate the essential functions of a job, which a qualified individual must perform.'"  Basith, 241 F.3d at 929 (quoting Benson v. Nortwest Airlines, Inc., 62 F.3d 1108, 1112-13 (8th Cir. 1995)). In reality, Squibb's suggestion would "result in a restructuring of both [her] job and the jobs of other employees.  This is not required by the ADA." Id. at 930 (citing Hansen v. Henderson, 233 F.3d 521, 523 (7th Cir. 2000)) ("The hospital could not be required to pair her with another nurse, or an orderly, who would follow her around to help her lift patients."); See  also Mays, 301 F.3d at 871 (citing Hansen, 233 F.3d at 523).

Squibb's bare assertion that she could perform the essential job function of lifting over 50 pounds with the assistance of mechanical lifting equipment similarly lacks merit.  Memorial concedes that it has explored ways in which lifting equipment could assist nurses with planned transfers, but not with unplanned falls.  Squibb offers no evidence how a mechanical lifting device would assist her in helping a patient from an unplanned fall, or in other emergency situations.  Accordingly, Squibb's unsupported assertion, without more, is not enough to create a genuine issue of material fact.  See Basith, 241 F.3d at 929.  Therefore, Memorial is entitled to summary judgment on Counts I, II, IV, VI, and VII.

II.     Retaliation Claims Under the ADA: Counts V, VIII, and IX

Squibb alleges that Memorial retaliated against her for filing the EEOC charge and the instant federal suit by: (1) failing to hire her for the LMRP Coordinator and Analyst positions (Counts VIII and IX), and (2) by terminating her employment in January 2005 (Count V).  In order to prove retaliation, Squibb may rely on either the direct or indirect method.  Under the direct method, Squibb may prove her case by relying on either direct evidence or circumstantial evidence.  Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004).  Direct evidence "'essentially requires an

51

admission by the [employer] that [its] actions were based upon the prohibited animus.'"  Id. (quoting Robin v. Espo Engineering Corp., 200 F.3d 1081, 1089 (7th Cir. 2000)).  A type of circumstantial evidence is suspicious timing or a causal connection between the protected activity and the adverse employment action.  Id. at 506.

Squibb has failed to present any such evidence of admission by Memorial that it did not hire her for the two LMRP positions and that it terminated her employment in 2005, all because she filed the EEOC charge and the instant suit.  Similarly, Squibb has failed to present any circumstantial evidence of retaliation, both with respect to her failure to hire claim and her termination claim.  Squibb filed the EEOC charge and commenced the instant action on January 30, 2003, and April 30, 2004, respectively.  She applied for the two LMRP positions on December 16, 2004, and was notified that she was not hired for the two positions in January 2005.  There is over a seven-month interval between Squibb's filing of the federal suit and Memorial's denial of her application for the two positions.  Similarly, there is over an 8 month gap between her commencement of the instant suit and her termination in January 2005.  Such a long interval is not enough to support an inference of retaliatory

motive.  See Franzoni v. Hartmarx Corp., 300 F.3d 767, 773 (7th Cir. 2002) (finding that "six months is too long to establish a causal link without more.").

Accordingly, the Court proceeds under the indirect method, which requires Squibb to present evidence demonstrating that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations (or, as to the positions for which she sought to be hired, she was qualified to perform the job to her employer's legitimate expectations); (3) despite her satisfactory job performance (or credentials), she suffered an adverse employment action from her employer; and (4) she was treated less favorably than similarly-situated employees who did not engage in statutorily protected activity.  Stone v. City of Indianapolis, 281 F.3d 640, 642 (7th Cir. 2002).  If Squibb can establish these four elements, then the burden shifts to Memorial to come forward with a legitimate, non-retaliatory reason for its adverse action.  Once Memorial presents its reason, the burden shifts to Squibb to show that Memorial's reason is pretextual.  Id.

The Court first turns to Squibb's claim that Memorial terminated her employment in January 2005 in retaliation for engaging in a statutorily

protected activity.  Squibb has presented sufficient evidence to establish two elements of a prima facie case.  Squibb engaged in a statutorily protected activity by filing a discrimination charge with the EEOC and subsequently filing the instant suit.   Second, Memorial's termination of Squibb's employment in 2005 qualifies as an adverse employment action because "an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits."  Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004) (citing Bell v. EPA, 232 F.3d 546, 555 (7th Cir. 2000)).

Squibb's claim, however, fails because she has not come forward with any evidence suggesting that she was performing her job according to her employer's legitimate expectations or that she was treated less favorably than similarly situated employees who did not engage in a statutorily protected activity.  Clearly Squibb was not performing to her employer's legitimate expectations.  She could not perform as an RN in patient care because she could not lift over 50 pounds.  She was transferred to another position at the hospital, that of Patient Placement Coordinator, but she did

not perform satisfactorily in that position.   She was rated "Below Expectations" in the categories of "Dependability/Attendance," "Job Knowledge," "Quality of Work," and "Motivation/Initiative."   She was additionally told that there were performance problems in that she failed to pay attention to detail on documents.   She then was on leave of absence from May 2003 - January 2005.   She failed to provide Memorial with any medical documentation of her condition from June 2004 - February 2005, although Memorial requested that she do so.   In December 2004, Memorial offered Squibb another position, of Patient Placement Coordinator and Clinical Case Manager, which she refused.   Thereafter, in January 2005, Memorial terminated Squibb because she failed to return to work from her leave of absence after being offered the Clinical Case Manager position. Additionally, she has pointed to no one else who was similarly situated to her who did not engage in a statutorily protected activity but remained employed.   She thus has failed to present a prima facie case under the indirect method as to Count V.

With respect to Squibb's claims that Memorial failed to hire her for the LMRP Coordinator and Analyst positions, Squibb has presented sufficient evidence to establish two elements of a prima facie case.  Squibb

engaged in a statutorily protected activity by commencing the instant suit. Memorial's failure to hire Squibb for the two LMRP positions qualifies as adverse employment actions.  However, Squibb's claim with respect to the LMRP Coordinator position is unavailing because she has failed to identify others similarly situated who were treated more favorably.  Indeed, the undisputed evidence shows that none of the 27 people who applied for the position, including Squibb, were hired for the position, and that the position in fact was eliminated without being filled.[8]

Similarly, Squibb's claim with respect to the LMRP Analyst position is also unavailing. Squibb testified that she possessed the requisite insurance coding experience for the Analyst position because she once worked in a doctor's office handling Medicare and Medicaid reimbursements.  Moreover, Cope testified that she learned the requisite insurance coding experience on the job.  However, Memorial argues that Squibb's limited coding experience working in a doctor's office in the 1980s was not sufficient.  Memorial eventually hired two individuals with the requisite coding experience for the

---

[8]The Court recognizes that Ruth Ann Cope became an LMRP Coordinator after she received a 50-pound permanent lifting restriction.  However, she is not similarly situated to Squibb because the criteria for the job had changed between the time Cope was hired and the time Squibb applied.

LMRP Analyst position.  Even if these facts were enough to create a genuine issue of fact as to whether Squibb was qualified for the LMRP Analyst position, Squibb's claim still fails because she again has not come forward with any evidence suggesting that she was treated less favorably than similarly situated employees who did not engage in a statutorily protected activity.  She has not pointed to any other person who was similarly situated to her, and who had not engaged in a statutorily protected activity, who was hired for the Analyst position.  Therefore, Squibb's retaliation claims are without merit.[9]  Memorial is entitled to summary judgment on Counts VIII, and IX.

III.     Retaliation Claim Under the Illinois Workers Compensation Act:
Counts III and X

The Court declines to exercise supplemental jurisdiction as to

---

[9]Squibb incorrectly asserts that, to establish a prima facie case of retaliation, she is required to demonstrate a causal connection between the protected activity and the adverse employment action.  Evidence of causal link was previously required under the indirect method.  However, that requirement has been eliminated since the Seventh Circuit's decision in Stone.  See Buie, 366 F.3d at 504 n. 3.  Squibb also incorrectly contends that an inference of retaliation can be seen from the evidence of suspicious timing between her filing of the instant suit, on April 30, 2004, and Memorial's rejection of her job applications for the two LMRP positions in January 2005.  However, this weak causal connection, without additional proof, is not enough to support an inference of retaliation.  See Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 711 (7th Cir. 2001) (finding that a three-month interval between the protected activity and the adverse employment action was insufficient to make out a prima facie case); see also Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918-19 (7th Cir. 2000).

Squibb's state law retaliation claims.

THEREFORE, Defendant Memorial Medical Center's Motion for Summary Judgment (d/e 41) is ALLOWED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: April 13, 2006.

FOR THE COURT:

<u>          s/  Jeanne E. Scott          </u>
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE